Michelle Brodhead, an individual,                         Civil No. 14-548 (DWF/LIB)

                    Plaintiff,

v.                                                                          **MEMORANDUM
                                                                         OPINION AND ORDER**

Knife River Corporation-North Central, a
Minnesota corporation,

                    Defendant.

---

Elizabeth L. Taylor, Esq., and Michael L. Puklich, Esq., Neaton & Puklich, P.L.L.P.,
counsel for Plaintiff.

Roger C. Justin, Esq., Rinke Noonan, counsel for Defendant.

---

# INTRODUCTION

This matter is before the Court on Defendant Knife River Corporation-North

Central's ("Knife River") Motion for Summary Judgment.  (Doc. No. 19.)  For the

reasons set forth below, Knife River's motion is granted in part and denied in part.

# BACKGROUND

Plaintiff Michelle Brodhead ("Brodhead") and her husband, Paige Brodhead,

began working as truck drivers for Knife River in May 2011.  (Doc. No. 26 ("Brodhead

Decl.") ¶¶ 2, 9.)  Brodhead asserts that she was hired with a starting wage of $16 per

hour, whereas her husband was hired with a starting wage of $17.50 per hour.  (*Id.* ¶ 9.)

Knife River asserts that Brodhead was hired in 2011 at a base rate of $17 per hour.  (Doc.

No. 22 ("Stover Decl.") ¶ 3, Ex. 3 ("Brodhead Time & Pay"); Doc. No. 23 ("Justin

Decl.") ¶ 3, Ex. C ("Foster Dep.") at 3.)

In late July 2011, on her first day of work at a site in Fordville, North Dakota,

Brodhead asserts that her supervisor, Jim Cass ("Cass"), referred to her as "Donuts"

because she did not bring him donuts that morning. (Brodhead Decl. ¶ 4.) Brodhead

claims that she asked Cass to refer to her by her name or truck number, but Cass

continued to refer to her as "Donuts." (*Id.*) Brodhead asserts that she complained to

Knife River's Human Rights Department ("HR") about the name-calling and was told

that an HR representative would talk to Cass about the incident. (*Id.* ¶ 5.)

Brodhead asserts that her complaint to HR did not stop Cass's name-calling. (*Id.*

¶ 7.) Following her complaint to HR, Brodhead claims that Cass told her that he was

aware that she had contacted HR and that he controlled her work schedule and could

determine: whether she would be called back to work the following year; whether she

would receive health insurance; and whether she would have enough hours to qualify for

unemployment compensation during the off-season winter months. (*Id.*) Brodhead

asserts that she reported Cass's conduct to HR and to her union representative. (*Id.* ¶ 8.)

Brodhead claims that she also reported to HR that Cass was assigning her fewer hours

than her male counterparts and was told that an HR representative would speak with Cass

about the issue. (*Id.* ¶ 6.) Brodhead also claims that she requested to be transferred to

another assignment under a different supervisor and in the same division as her husband.

(*Id.* ¶¶ 8, 10.)

In response to Brodhead's request, Knife River offered Brodhead and her husband jobs in Noonan, North Dakota, which they accepted. (*Id.* ¶ 13.) In Noonan, Brodhead asserts that she protested bullying and mistreatment of minority workers by one of her coworkers, David Prickett ("Prickett"). (*Id.* ¶ 14.) Specifically, Brodhead asserts that she observed Prickett mocking another worker of Somali descent and that she told Prickett to "knock it off." (*Id.*) Brodhead claims that Prickett responded angrily and told her that he had done time in a California prison for stabbing someone so she should "watch out." (*Id.*) Following this incident, Brodhead asserts that she complained to her supervisor, Curt Graves ("Graves"), who was also present during the incident, and was told to simply ignore Prickett. (*Id.*) Brodhead does not know whether Knife River formally disciplined Prickett following the incident. (*Id.* ¶ 15.)

In September 2011, Brodhead, her husband, and Knife River construction crew members were moved to a site in New Town, North Dakota. (*Id.* ¶ 18.) Brodhead asserts that she was one of only two women at the New Town site. (*Id.* ¶ 19.) Brodhead claims that while she was at the New Town site, Graves requested that she cook for the other workers at the site and, in exchange, Brodhead asserts that Graves informed her that she would be released from her trucking duties an hour before everyone else and would be paid for two additional hours to cook dinner at the site. (*Id.*) Brodhead asserts that none of the male workers at the site were asked to cook or to share in the grocery shopping or clean-up responsibilities. (*Id.*)

In October 2011, Brodhead asserts that she was riding as a passenger in a truck driven by her coworker, Mark Fordyce ("Fordyce"), when Prickett drove alongside

Fordyce's side of the truck and attempted to run it off the road. (*Id.* ¶ 20.) Brodhead and Fordyce reported the incident to Jeff Lambert ("Lambert"), the Knife River Safety Manager. (*Id.* ¶ 21.) Brodhead asserts that she also called Knife River's Sauk Rapids headquarters to report the incident as well as the previous incident in Noonan involving Prickett's comments to Brodhead and her coworker of Somali descent. (*Id.*) In response to Brodhead's report, Lambert visited the New Town site and spent a day speaking with Knife River employees, including Graves, but did not speak with Brodhead. (*Id.* ¶ 22.) Brodhead asserts that following Lambert's meeting with Graves during his visit, Graves approached her and berated her for reporting the incidents to headquarters. (*Id.*)

In February 2012, Brodhead asserts that Graves asked her whether she and her husband would be willing to return to North Dakota to work during the 2012 construction season. (*Id.* ¶ 25.) Brodhead asserts that Graves assured her that Prickett was gone and that "things would be different going forward." (*Id.*) Brodhead claims that based on these assurances, she returned to New Town with her husband in April 2012. (*Id.* ¶ 26.)

Brodhead asserts that her employment with Knife River did not improve under different supervision at the New Town site. (*Id.*) Brodhead claims that during her first meeting with her supervisor at the New Town site, Al Stocker ("Stocker"), he stated that "women are only good for two things, and neither one of them is road construction." (*Id.*) Brodhead claims that she was assigned very little work under Stocker's supervision and that Stocker favored male employees over female employees. (*Id.* ¶ 27.) Brodhead asserts that on three occasions between May and June 2012, Stocker texted her offensive sex jokes and pornographic pictures. (*Id.* ¶¶ 29, 30; Doc. No. 29 ("Puklich Decl.") ¶ 17,

Ex. L ("Brodhead Dep.") at 46.)  Brodhead claims that she reported Stocker's conduct to HR, but her reports were ignored.  (Brodhead Decl. ¶¶ 29, 30.)  Brodhead claims that Stocker continued to make offensive comments to her and her husband.  (*Id.* ¶¶ 31, 32.)

Brodhead asserts that Stocker used a racial epithet to refer to a coworker at a party in 2012.  (*Id.* ¶ 30.)  Brodhead asserts that, in a later incident on July 20, 2012, Stocker grabbed a driver of Somali descent and dragged him out of his truck after an altercation. (*Id.* ¶ 33.)  Brodhead claims that she reported the July 20, 2012 incident to a coworker, Joe Kampa ("Kampa"), who investigated and reported the incident to the President of Knife River.  (*Id.* ¶ 34.)  Stocker was removed from the site the same day and was terminated shortly thereafter.  (*Id.* ¶ 35; Doc. No. 12 ("Def.'s Statement of Case") at 2.) Knife River contends that the information Brodhead provided was relied on by Knife River to make the decision to terminate Stocker.  (Def.'s Statement of Case at 2.)

Within a week of Stocker's departure from the New Town site, Brodhead asserts that she received a phone call from Graves stating that she would be replaced as a water tanker driver by a man named Jim Wannebo ("Wannebo").  (Brodhead Decl. ¶ 36.) Brodhead claims that she had to train Wannebo several times before he was able to operate the water tanker truck.  (*Id.*)  Brodhead asserts that she asked Graves for her position back and was told that Graves wanted Wannebo to keep the job.  (*Id.*)  Brodhead asserts that Wannebo received more compensation than she did in 2012.  (*Id.*)

In late July 2012, Brodhead asserts that her camper at the New Town site was broken into and damaged.  (*Id.*; Brodhead Dep. at 54-56, 73.)  Brodhead asserts that during the break-in, her underwear had been removed from drawers, strewn around, and

stolen. (Brodhead Decl. ¶ 39.) Brodhead asserts that a coworker informed her that another employee, Randy Rakke ("Rakke"), was responsible for the break-in. (*Id.*) Brodhead claims that she reported this information to Graves, Kampa, and Knife River managers, but no follow-up action was taken. (*Id.* ¶ 40.)

In early 2013, Brodhead asserts that she received a letter from HR asking her to meet with Knife River attorneys in preparation for a suit brought by a female Knife River employee against Knife River. (*Id.* ¶ 43.) Brodhead asserts that over the course of her subsequent conversation with an HR representative, she complained about the July 2012 break-in incident, but never received a follow-up response. (*Id.*)

In early June 2013, Brodhead asserts that she moved from job to job while her husband worked elsewhere. (*Id.* ¶ 44.) During this time, Brodhead asserts that she was denied work while Knife River was hiring men straight out of truck driving school and paying them more than she had been paid. (*Id.*)

In late June 2013, Brodhead returned to work at Knife River. (*Id.* ¶¶ 46-47.) Upon her return to work, Brodhead discovered that the air-conditioning in her truck was malfunctioning. (*Id.* ¶ 47.) Brodhead asserts that both she and her husband reported the lack of air-conditioning in her truck as a safety hazard to HR. (*Id.*) Brodhead claims that an HR representative told her that the issue would be looked into and, approximately 1.5 months later, the HR representative had her air-conditioning fixed. (*Id.*; Brodhead Dep. at 63-64.) Brodhead asserts that during this time, all other employees' air-conditioning was working and a male employee was provided a new air-conditioning

unit in an on-site facility even though that facility already had air-conditioning.
(Brodhead Decl. ¶ 47; Brodhead Dep. at 64.)

In July 2013, Brodhead was transferred to a different site, where she claims that her new supervisor, Kevin Demarais ("Demarais"), spearheaded a campaign against her to spread false accusations that she was improperly talking on her cell phone while hauling materials. (Brodhead Decl. ¶ 49.) Brodhead asserts that on one occasion, Demarais approached her in front of an entire crew of drivers and accused her of bad-mouthing Knife River and cussing over her radio device, even though Brodhead claims that male truck drivers frequently cuss over their radios and use offensive communications while driving and at job sites. (*Id.* ¶ 50.)

Brodhead asserts that the next day, she was again approached by Demarais regarding a report that she was using her phone while driving, which Brodhead denied. (*Id.* ¶ 52.) Brodhead asserts that she reported Demarais's conduct in approaching her about the report to another supervisor, who Brodhead claims addressed the problem with Demarais. (*Id.* ¶ 54.)

In late July 2013, Brodhead asserts that Bill Ellis ("Ellis"), Knife River's Safety Director, approached her and asked her if she had been on the phone. (*Id.* ¶ 56.) Brodhead asserts that she told Ellis that she had not been on the phone and that Ellis looked in the truck and confirmed that there was no phone in the truck. (*Id.*; Brodhead Dep. at 16-17.) Brodhead asserts that many of her male coworkers talk on their phones while driving, and that both she and Ellis could see a number of drivers on their phones while driving during the course of their conversation. (Brodhead Decl. ¶ 56.)

On or around July 20, 2013, Demarais approached Brodhead and asked if she had been on the phone. (*Id.* ¶ 57.) Brodhead asserts that when she responded that she had not been on the phone, Demarais replied that someone had seen her on the phone. (*Id.*) Brodhead claims that she told Demarais to stop talking to her, and then called Joe Foster ("Foster"), Knife River's Trucking Operations Supervisor, to report the incident. (*Id.*)

On July 22, 2013, Brodhead asserts that Demarais told her that she was fired from her employment with Knife River. (*Id.* ¶ 58.) Knife River denies this assertion, and instead contends that Brodhead was told that she was suspended for three days for violating Knife River's phone use policy. (Def.'s Statement of Case at 2; Puklich Decl. ¶ 20, Ex. O ("Stover Dep.") at 66.)

On the morning of July 23, 2013, Brodhead asserts that her husband called Foster to plead for her job. (Brodhead Decl. ¶ 59.) Brodhead claims that during that call, Foster did not clarify that Brodhead had not been discharged by Knife River. (*Id.*) Brodhead asserts that following the phone call, she packed her belongings and departed the site for Minnesota. (*Id.* ¶ 60.)

Knife River contends that Brodhead was terminated effective July 23, 2013, because she resigned and asserts that Brodhead was notified of her termination by an HR representative, Janelle Adelman ("Adelman"), on July 23, 2013. (Puklich Decl. ¶ 14, Ex. H ("Employee Termination Information"); Stover Dep. at 67.)

A few days later, Brodhead received a letter dated July 25, 2013 from Ann Affeldt ("Affeldt"), Knife River's Payroll/Benefits Coordinator, regarding her benefits. (Puklich Decl. ¶ 14, Ex. I ("July 25, 2013 Letter").) The subject line of the July 25, 2013 letter

stated "Termination of Employment 7/23/13." (*Id.*) Brodhead asserts that pursuant to the letter, she applied for unemployment benefits and indicated in her benefits application that she had been discharged from employment. (Brodhead Decl. ¶ 62.) Following her application submission, Brodhead asserts that she was surprised by Knife River's response to a Department of Employment and Economic Development questionnaire stating that she had not been discharged, but instead had been suspended for three days for violating a company policy and had quit. (*Id.*) Brodhead asserts that Knife River never contacted her to clarify that it had only intended to suspend her for three days or to ask her if she might be interested in returning to Knife River. (*Id.*)

On February 27, 2014, Brodhead commenced this lawsuit against Knife River. (*See* Doc. No. 1 ("Compl.").) Brodhead subsequently filed an Amended Complaint and Second Amended Complaint. (*See* Doc. No. 10 ("Am. Compl."); Doc. No. 18 ("Second Am. Compl.").) In her Second Amended Complaint, Brodhead asserts the following claims: (I) Violation of the Equal Pay Act; (II) Gender Discrimination in Violation of the Minnesota Human Rights Act; (III) Reprisal and Sexual Harassment in Violation of the Minnesota Human Rights Act; (IV) Violation of the Minnesota Whistleblower Act; and (V) Negligence. (Second Am. Compl. ¶¶ 79-114.)

Defendant Knife River now moves for summary judgment on all claims. (Doc. No. 19.)

# DISCUSSION

## I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Knife River's Motion for Summary Judgment

### A.    Count I

Knife River argues that it is entitled to summary judgment on Brodhead's

Equal Pay Act ("EPA") claim in Count I of her Second Amended Complaint.  The EPA

provides, in relevant part, as follows:

> No employer . . . shall discriminate . . . between employees on the basis of
> sex by paying wages to employees . . . at a rate less than the rate at which
> he pays wages to employees of the opposite sex . . .  for equal work on jobs
> the performance of which requires equal skill, effort, and responsibility,
> and which are performed under similar working conditions, except where
> such payment is made pursuant to (i) a seniority system; (ii) a merit system;
> (iii) a system which measures earnings by quantity or quality of production;
> or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1).  To establish a prima facie case under the EPA, Brodhead must

show that she was paid less than a male worker for equal work in jobs that required equal

skill, effort, and responsibility, and that were performed under similar working

conditions.  *See Bearden v. Int'l Paper Co.*, 529 F.3d 828, 833 (8th Cir. 2008); *Taylor v.*

*White*, 321 F.3d 710, 715 (8th Cir. 2003) (citing *Buettner v. Arch Coal Sales Co.*, 216

F.3d 707, 719 (8th Cir. 2000)).  If Brodhead can make this showing, the burden shifts to

Knife River to show that the pay differential was based on a factor other than gender.  *See*

*Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (quoting 29 U.S.C.

§ 206(d)(1)); *Taylor*, 321 F.3d at 716.

Knife River argues that Brodhead cannot establish a prima facie case under the

EPA because she cannot meet the threshold requirement of showing that she was paid

less than male comparators.  (Doc. No. 21 at 21.)  Knife River first contends that

Brodhead was hired at the same rate as most other workers, both male and female. (*Id*.) Knife River asserts that, "[l]ooking at all drivers brought on in 2011, the pay records clearly indicate that Plaintiff started at the same base pay rate as most other employees hired that year." (*Id*. at 23.) Knife River argues that, "[i]f anything, she was paid more than her male counterparts." (*Id*.) In addition, Knife River argues that Brodhead's "pay records show that the vast majority of her work through Knife River was on prevailing wage jobs or on jobs in North Dakota in which Knife River paid a prevailing wage even though it was not legally required to do so." (*Id*.) Knife River further argues that "[i]n relation to the number of hours assigned to work, Plaintiff admitted herself that the purportedly low number of hours she was getting had nothing to do with her gender, but that occasional lack of work was a problem for a number of Knife River truck drivers, male and female." (*Id*.) However, despite these arguments submitted by Knife River in its briefs, Knife River conceded that material issues of fact exist to preclude summary judgment on Count I at the April 10, 2015 motion hearing.

Brodhead argues that she has "produced evidence from which a trier of fact could find that Plaintiff was paid less per hour than several male comparators during her employment who performed the same work." (Doc. No. 25 at 24.) Brodhead relies on declarations submitted by herself, her husband, and Sean Laney ("Laney"), who was hired as a truck driver by Knife River in 2011, to show that comparative male truck drivers were hired at higher base rates in 2011 and received higher pay raises in 2012 and 2013 than she received. (*See generally* Brodhead Decl.; Doc. No. 27 ("Paige Decl."); Doc. No. 28 ("Laney Decl.").) In addition, Brodhead counters that

Knife River's hiring data fails to describe "the qualifications of these individuals, what specific position they were hired for, their job experience or skills, where they worked, and under what conditions." (Doc. No. 25 at 36.) Brodhead further argues that "the record in this case as to wage disparity is highly disputed," and therefore, Knife River's motion for summary judgment on her EPA claim must be denied. (*Id.* at 38-39.)

The Court finds that Brodhead has raised a genuine issue of material fact regarding her EPA prima facie case to preclude summary judgment on Count I. *See Krenik*, 47 F.3d at 957. Specifically, the Court determines that there is sufficient conflicting evidence in the record as to whether Knife River paid Brodhead less than it paid similarly-situated male employees to create a genuine issue for trial. For example, Brodhead submits her husband's W-2 form as evidence that other male truck drivers with similar work experience and tenure at Knife River were paid more than she was paid during the same period. (*See* Brodhead Decl. ¶ 28, Ex. D ("W-2").) Knife River, by contrast, submits pay records showing that Brodhead was not paid less than other male truck drivers during the same period. (*See* Brodhead Time & Pay.) Accordingly, viewing the evidence in the light most favorable to Brodhead, the Court finds that there are genuine issues of material fact to preclude summary judgment on the issue of whether Brodhead was paid equal pay for equal work when compared to her male colleagues. *See Weitz*, 574 F.3d at 892. Therefore, the Court denies Knife River's motion for summary judgment with respect to Count I of Brodhead's Second Amended Complaint.

## B.    Counts II and III

Knife River argues that it is entitled to summary judgment on Counts II and III of Brodhead's Second Amended Complaint, which allege gender discrimination and reprisal and retaliatory harassment, respectively, under the Minnesota Human Rights Act ("MHRA").  Under the MHRA, an employer may not "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of that person's gender.  Minn. Stat. § 363A.08, subd. 2.  The MHRA also prohibits an employer from engaging in any reprisal against an employee who opposes an unlawful employment practice.  *Id.* § 363A.15.  "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment."  *Id.*

Both gender discrimination and reprisal claims brought pursuant to the MHRA are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932 (8th Cir. 2011); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 719 (8th Cir. 2008).  "Under the *McDonnell Douglas* framework, the plaintiff employee has the initial burden of establishing a prima facie case under the statute."  *Hitchcock v. FedEx Ground Package Sys., Inc.*, 442 F.3d 1104, 1106 (8th Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 800-04).  Once a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for its action.  *Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013).  If such a reason is offered, then the plaintiff must show that the employer's proffered reason is merely a pretext for discrimination.  *Id.*; *see also Skalsky v. Indep. Sch. Dist. No. 743*, 772

F.3d 1126, 1131 (8th Cir. 2014) (providing that the plaintiff must "offer proof that would allow a rational fact-finder to conclude that the proffered reason was not the true reason for the employment action").

### 1. Brodhead's Prima Facie Case of Gender Discrimination

To establish a gender discrimination claim, a plaintiff must show that she: "(1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated persons of the opposite sex." *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 693 (8th Cir. 2001).

Brodhead argues that she has presented sufficient facts to establish her prima facie case of gender discrimination. (Doc. No. 25 at 26.) Brodhead contends that, "[a]s a woman who was terminated by Knife River, Plaintiff readily meets the first and third requirements of her prima facie case for gender discrimination" and that "Defendant has[] not disputed that Plaintiff meets the second prong of the prima facie case." (*Id.*) Brodhead asserts that, with respect to the third element, "there is ample evidence in the record of this case from which a trier of fact could find that Plaintiff was discriminated against because of her gender." (*Id.*) In support of this assertion, Brodhead points to the following incidents described in her declaration as examples of instances in which she was treated differently than similarly-situated men: (1) the response by Brodhead's supervisors to her report of the camper break-in, which she claims "were inconsistent with the way . . . the workforce in general could expect to be treated"; (2) her supervisor's "consistent assignment of all male truck drivers in the camp ahead of

Plaintiff"; (3) her supervisor's request that she cook for crew members in light of the fact that none of the men at the camp were asked to cook for the camp; and (4) her supervisor's reprimand for her "cussing on the CB radio" while her male coworkers often cussed over the radio without reprimand. (*See, e.g.*, Brodhead Decl. ¶¶ 19, 40, 50.)

Knife River, on the other hand, argues that Brodhead has failed to establish a prima facie case of gender discrimination. (Doc. No. 21 at 19.) First, Knife River argues that, even assuming Brodhead can satisfy the first three elements of her prima facie case, she cannot show that she was treated differently than similarly-situated male employees. (*Id.* at 10-20.) Knife River contends that the only complaint asserted by Brodhead that relates to her gender concerned the inappropriate sexually explicit text messages she received from her coworker, for which the coworker was terminated, but that this complaint alone does not amount to discrimination. (*Id.* at 10.) Knife River contends that "[a]ll of the other grievances Plaintiff details have nothing to do with her or gender." (*Id.* at 11.) Knife River asserts that "[h]er complaints of alleged discrimination against Somali drivers, not even directed at her, does not involve sex discrimination in any fashion" and that "[s]imilarly, her complaints about lack of hours to work, and another employee threatening her, are not sex based." (*Id.* at 14.) Knife River argues that "Plaintiff has completely failed to describe how she was being singled out because of her gender" and that "she admitted repeatedly that workers of both genders faced the same harsh conditions." (*Id.* at 19.) Therefore, Knife River contends that because Brodhead has failed to satisfy the fourth element of her prima facie case of gender discrimination, it is entitled to summary judgment on Count II.

The Court concludes that a reasonable juror could find that Brodhead has satisfied her burden of presenting a prima facie case of gender discrimination under the MHRA. First, the Court finds, and the parties do not appear to dispute, that Brodhead has met the first, second, and third elements of her prima facie case by establishing that she is a woman with considerable experience who was terminated from her employment with Knife River.[1] Second, although it is a close call, the Court finds that Brodhead has presented sufficient evidence to meet the fourth prong of her prima facie case by showing that she was treated differently than similarly-situated male employees. *See Bearden*, 529 F.3d at 832 (citing *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 701 (8th Cir. 2006)). Brodhead has presented evidence that: (1) she was asked to perform certain jobs, such as cooking for other workers at the New Town site, that her male counterparts were not asked to perform; (2) she was reprimanded for swearing over the radio while her male counterparts often swore over the radio without reprimand; (3) she was told by her male supervisor that "women are only good for two things, and neither one of them is road construction"; (4) she was removed from her position as water tanker driver and replaced by a male driver who required substantial training under her guidance; and (5) she was consistently assigned her work schedule behind the male truck drivers. (Brodhead Decl. ¶¶ 5, 19, 26, 27, 36, 50.) Considering the totality of the evidence, the Court concludes that a reasonable juror could find that Brodhead has met her burden of establishing a

---

[1]     To the extent that Knife River contends that Brodhead voluntarily quit after being given a three-day suspension for improper phone use, rather than being terminated, Knife River concedes that, "[f]or purposes of summary judgment, it is immaterial that Knife River believed Ms. Brodhead voluntarily quit." (Doc. No. 30 at 6.)

prima facie case under the MHRA.[2]  *See Hervey*, 527 F.3d at 719; *Hitchcock*, 442 F.3d at 1106.

### 2.      **Brodhead's Prima Facie Case of Reprisal**

Brodhead next argues that she has established a prima facie case of reprisal under the MHRA.  (Doc. No. 25 at 33.)  To establish a prima facie case of reprisal, Brodhead must show:  (1) a statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  *See Chivers*, 641 F.3d at 932 (citing *Cross v. Cleaver*, 142 F.3d 1059, 1076 (8th Cir. 1998)).

Brodhead argues that with respect to the first element, "[t]hat Plaintiff engaged in statutorily protected conduct is indisputable" as she opposed multiple practices forbidden under the MHRA and filed a charge with respect to those practices.  (Doc. No. 25 at 33.) Brodhead asserts that "[o]ver the course of her employment, Plaintiff experienced reprisal on a number of occasions," such as the incident in 2012 when "Plaintiff reported that Al Stocker was abusing black drivers and also subjecting her to sexual harassment" and, when, in response, Stocker "retaliated by withholding work from her." (*Id.* at 34.) Brodhead argues that "this Court need not decide whether this kind of reprisal would, alone, sustain a claim under the MHRA because, in fact, Knife River eventually reprised against Plaintiff by terminating her employment." (*Id.*)  Brodhead contends that

---

[2]      To the extent that Brodhead's gender discrimination claim is based on allegedly receiving unequal pay for equal work when compared to her male coworkers, that claim survives summary judgment for the reasons discussed above with respect to her EPA claim.  *See Price*, 664 F.3d at 1191 (providing that "unequal pay for equal work" claims brought under the MHRA are governed by the same standards as EPA claims).

"Defendant terminated Plaintiff just one day after she last complained of conduct violative of the MHRA," which Brodhead asserts "is evidence clearly suggestive of reprisal, particularly given the rush to judgment on Knife River's part which appears to be wholly unprecedented." (*Id.* at 35.) Moreover, Brodhead argues that during her entire employment with Knife River, she was "subjected on an ongoing basis to harassment []based on her gender . . . and that she would be retaliated against for complaining to management about her treatment and the treatment of other minority workers employed by Knife River." (*Id.* at 1.) Therefore, Brodhead argues that she has established a prima facie case of reprisal to preclude summary judgment on Count III.

Knife River, on the other hand, argues that Brodhead has failed to satisfy the third element of a prima facie claim of reprisal because Brodhead cannot demonstrate a causal connection between the alleged protected activity and adverse action. (Doc. No. 21 at 16.) Knife River asserts that "[t]he protected reporting she engaged [in] are possibly two events: her 2011 complaint about David Pricket[t] and her 2012 complaint against Al Stocker." (*Id.*) Knife River argues that "[e]ven ignoring the fact that Knife River would have no reason to retaliate against an employee for a complaint which they found valid, the timing is just too far apart to be considered causal." (*Id.* at 16-17.) Knife River asserts that Brodhead admits that in 2013, the year she was terminated, she did not make a single report of anything sexual directed at her and did not make a single report of any allegedly discriminatory behavior based on either race or sex. (*Id.* at 17.) Furthermore, Knife River contends that "[t]here is no evidence that the decision-makers in the disciplinary actions concerning Plaintiff were even aware that she had reported allegedly

discriminatory behavior in previous years, and it is therefore impossible for her to meet the causal connection element of a retaliation claim." (*Id.*)  Accordingly, Knife River argues that because Brodhead has failed to establish her prima facie case of reprisal, it is entitled to summary judgment on Count III.

The Court finds that Brodhead has failed to meet her burden of establishing a prima facie case of reprisal under the MHRA.  Viewing the evidence in the light most favorable to Brodhead, and even assuming that Brodhead satisfied the first two elements of her prima facie case, no reasonable juror could find that a causal connection exists between the alleged protected activity (her reports) and adverse action (her termination). Without any factual support in the record to support this causal connection, Brodhead cannot make out her prima facie case.  *See Chivers*, 641 F.3d at 932; *Hitchcock*, 442 F.3d at 1106.  Therefore, the Court finds that Brodhead has failed to satisfy her burden of showing a prima facie case of reprisal under the MHRA.

In sum, the Court concludes that Brodhead has set forth sufficient evidence to support her prima facie case of gender discrimination, but not reprisal, under the MHRA. The Court further concludes that Brodhead has presented sufficient evidence to allow a reasonable juror to find that Knife River's proffered reason for her termination—that she did not return to work following her three-day suspension and violated company policy by using her cell phone while driving—was pretext, and that her gender was the motivating factor for her termination.  *See Krenik*, 47 F.3d at 960.  As a result, viewing the evidence and all reasonable inferences in the light most favorable to Brodhead, the Court finds that Brodhead has satisfied her burden under the *McDonnell Douglas*

framework with respect to her gender discrimination claim, but not her reprisal claim, pursuant to the MHRA. Accordingly, the Court denies Knife River's motion for summary judgment with respect to Count II and grants Knife River's motion for summary judgment with respect to Count III.

### C.    Counts IV and V

Knife River argues that it is entitled to summary judgment on Counts IV and V of Brodhead's Second Amended Complaint, which allege claims under the Minnesota Whistleblower Act ("MWA") and common law negligence. (Doc. No. 21 at 20-21, 24-25.) With respect to Brodhead's MWA claim, Knife River argues that the claim is barred by the MHRA's exclusivity provision that prohibits the separate maintenance of a claim under the MWA. (*Id.* at 20.) As to Brodhead's common law negligence claim, Knife River argues that, "[l]ike her claim under the Whistleblower Act, Plaintiff's negligent supervision claim is preempted as a matter of law by her Minnesota Human Rights Act claims" and "Plaintiff cannot pursue Minnesota Human Rights Act claims and common law negligence claims simultaneously, because these claims arise from the same underlying facts and the duties owed to Plaintiff are the same under both the common law and the Minnesota Human Rights Act." (*Id.* at 24.)

In response, Brodhead appears to generally agree with Knife River's arguments. Brodhead asserts that, "as this case presently stands, Plaintiff does not intend to pursue either her MWA or negligence theories at trial." (Doc. No. 25 at 39.) Brodhead further asserts that the MWA and negligence claims "were pled to preserve them in the event the

MHRA claims were dismissed" and that "[s]he is content to proceed on her MHRA claims and the Equal Protection Act claim."  (*Id.*)

The Court notes at the outset that, to the extent that Brodhead rests her MWA or negligence claims on the same facts and alleged discriminatory or retaliatory practices as her MHRA claims, the MHRA's exclusive remedy provision bars Brodhead's whistleblower and negligence claims.  The MHRA exclusivity provision states that "as to acts declared unfair by sections 363A.08 to 363A.28, subdivision 10, the procedure herein provided shall, while pending, be exclusive."  Minn. Stat. § 363A.04.

Pursuant to the MHRA's exclusivity provision, courts have held that plaintiffs may not simultaneously pursue claims under the MHRA and under the MWA or common law negligence if certain conditions are not satisfied.  With respect to the preclusion of claims under the MWA, the Minnesota Supreme Court has clearly held that "an employee may not seek redress for the same allegedly discriminatory practices on the same facts under both the MHRA and the Whistleblower Act ["MWA"]," *Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 347 (Minn. 2002), and "the exclusivity provision of the [MHRA] operates as a bar to the separate maintenance of [the employment discrimination] claim under the Whistleblower Act ["MWA"]," *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 486 (Minn. 1996).  In addition, with respect to the preclusion of separate common law negligence actions, courts have held that "a plaintiff may simultaneously pursue claims under the MHRA and common law negligence that arise from the same underlying facts," only if the plaintiff's negligence claims are "founded on a duty of care independent from duties owed under the MHRA."

*Burns v. Winroc Corp.*, 565 F. Supp. 2d 1056, 1069 (D. Minn. 2008) (internal citations and quotations omitted).

Here, as Knife River asserts, Brodhead appears to base her MWA and common law negligence claims on the same facts or duties encompassed in her MHRA claims. (*See generally* Second Am. Compl.) Therefore, the Court concludes that Brodhead's MWA and negligence claims are barred to the extent that she is claiming retaliation under the MWA based on the same facts and discriminatory or retaliatory practices as alleged in her MHRA claims. However, in light of Brodhead's above assertions, the Court finds that summary judgment on Counts IV and V is premature.

## ORDER

Based on the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. No. [19]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. Defendant's Motion for Summary Judgment with respect to Count III is **GRANTED**.

   b. Defendant's Motion for Summary Judgment with respect to Counts I, II, IV, and V is **DENIED**.

2. Count III of Plaintiff's Second Amended Complaint (Doc. No. [18]) is **DISMISSED WITH PREJUDICE**.

3. The Court urges the parties to consider a settlement to resolve this dispute, with or without the assistance of United States Magistrate Judge Leo I. Brisbois, because

a settlement might well serve the best interests of all parties. If the Court can be of assistance in this matter, the parties should contact Brenda Schaffer, Calendar Clerk for the undersigned, at (651) 848-1296, or Vicki Miller, Courtroom Deputy for Magistrate Judge Brisbois, at (218) 529-3520.

Dated: July 20, 2015     s/Donovan W. Frank
              DONOVAN W. FRANK
              United States District Judge